UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**NICHOLAS ZADRAVEC,**

    **Petitioner,**

**v.**                                     **Case No. 8:18-cv-1972-MSS-AEP**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

    **Respondent.**

_____/

# O R D E R

Zadravec petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for theft, grand theft,  burglary, armed burglary, criminal mischief, and possession of cannabis for which he is serving 8 years of prison followed by 30 years of probation. (Doc. 1 at 1) After reviewing the petition (Doc. 1), the response and appendix (Docs. 11), and the reply (Doc. 13), the Court **DENIES** the petition.

## PROCEDURAL HISTORY

The prosecution charged Zadravec with thirteen crimes in five different cases. In case number 13-CF-3676, an information charged Zadravec with grand theft, burglary of an unoccupied dwelling, and criminal mischief. (Doc. 11-2 at 2–7) In case number 13-CF-3733, an information charged Zadravec with armed burglary of a dwelling, grand theft, and criminal mischief. (Doc. 11-2 at 36–41) In case number 13-CF-3677, an information charged Zadravec with burglary of an unoccupied dwelling and grand theft. (Doc.  11-2 at 58–63) In case number 13-CF-3678, an information charged Zadravec with burglary of an unoccupied dwelling and petit theft. (Doc. 11-2 at 72–77) In case  number 13-CF-3679, an information charged

Zadravec with burglary of an unoccupied dwelling, grand theft, and possession of cannabis. (Doc. 11-2 at 86–91)

Facing a life sentence for the armed burglary and an aggregate 141 years for the other crimes, Zadravec pled guilty to all the charges without a plea agreement and moved for a downward departure. (Docs. 11-2 at 9–12, 43–46, 65–68, 79–82, 93–96 and 11-5 at 110–11) The trial court departed downward from the lowest permissible sentence of 13 years (Doc. 11-5 at 111) and sentenced him to 8 years of prison followed by 30 years of probation in case number 13-CF-3676 (Doc. 11-2 at 14–21), a concurrent 8 years of prison followed by 30 years of probation in case number 13-CF-3733 (Doc. 11-2 at 48–56), a concurrent 15 years of probation in case number 13-CF-3677 (Doc. 11-2 at 70), a concurrent 15 years of probation in case number 13-CF-3678 (Doc. 11-2 at 84), and a concurrent 15 years of probation in case number 13-CF-3679. (Doc. 11-2 at 98)

Zadravec did not appeal his convictions and sentences. The post-conviction court denied Zadravec relief after an evidentiary hearing (Doc. 11-4 at 3–34), and the state appellate court affirmed. (Doc. 11-6 at 93) Zadravec's federal petition followed.

## STANDARDS OF REVIEW

**AEDPA**

Because Zadravec filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Zadravec asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at

690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

By pleading guilty, a defendant waives all non-jurisdictional claims arising before the guilty plea. *Stano v. Dugger*, 921 F.2d 1125, 1150 (11th Cir. 1991) (citing *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)). However, a defendant has the right to effective assistance of counsel before pleading guilty. *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985). Therefore, the two-part test under *Strickland* applies to an ineffective assistance of counsel claim arising before a guilty plea. *Hill*, 474 U.S. at 58.

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without a written opinion the post-conviction court's order denying Zadravec relief. (Doc. 11-6 at 93) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The post-conviction court provided reasons for denying Zadravec's claims in a written order. (Doc. 11-4 at 3–34)

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must

(1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court instead denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

**Ground One and Ground Two**

In Ground One, Zadravec asserts that trial counsel was ineffective for not moving to suppress his confession to police. (Doc. 1 at 5–8) He contends that police interrogated him without advising him of his constitutional rights, he could not have waived those rights because he was under the influence of drugs, and police threatened and coerced him to secure his confession. (Doc. 1 at 5–8) In Ground Two, Zadravec asserts that trial counsel was ineffective not moving to suppress evidence seized during unlawful and warrantless searches of both his car and his home. (Doc. 1 at 9–11)

The post-conviction court denied the claims as follows (Doc. 11-4 at 4–24) (state court record citations omitted) (bolding in original omitted)[1]:

> [Zadravec] alleges while Detective Core was searching his truck, two of the officers, who identified themselves as officers from District Four Hillsborough County Sheriff's Office stated to Defendant that "they know he committed a series of burglaries in the area and that they also know he was a drug addict, and if he would admit to the burglaries they could help him." He alleges Detective Core returned from his search of Defendant's truck displaying a small bag of marijuana and a few pieces of jewelry that he allegedly found in Defendant's truck. He alleges Detective Core stated, "Defendant would be arrested anyway because of the marijuana." He alleges he was taken to the Hillsborough County Sheriff's Office.
>
> He alleges after being placed in a holding cell for an hour, he was escorted into an interrogation room. He alleges Detective Core began interrogating Defendant about a series of burglaries being committed and Defendant's alleged drug addiction. He alleges Detective Core stated his boss wanted to clean the books and suggested that Defendant should admit to the alleged burglaries and he would get him help for his drug addiction. He alleges he then made incriminating statements regarding the alleged burglaries in cases 13-CF-003677, 13-CF-003678, and 13-CF-003679. Defendant further alleges Detective Core also implicated Defendant during this interrogation that he committed the alleged burglaries in cases 13-CF-003733 and 13-CF-003676. He alleges he denied the allegations.
>
> He alleges he was placed back in the holding cell and informed that a search of his house would be conducted. He alleges he objected to the search of his home and stated to police there was nothing at his house. He alleges a few hours later, he was escorted into the cafeteria where a Sergeant, Detective Core, and nine other detectives were waiting. He alleges the Sergeant informed him that the search of his home was conducted and pointed to items on the table allegedly taken from his home. He alleges the Sergeant informed him he was a liar. He alleges he advised them he did not know what they were talking about.

---

[1] The post-conviction court's order in the record on federal habeas is missing pages 2 through 5. (Doc. 11-4 at 3–4) Pagination from the state appellate court's record at the bottom right of the order shows that the record on post-conviction appeal was also missing those pages. (Doc. 11-4 at 3–4) The Court's review on federal habeas is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

He alleges the Sergeant advised him "his fiancé Crystal Duran and kids were left at the house and if he did not admit to the burglaries, he would be arrested for the marijuana and they (police) would go arrest his fiancé due to her outstanding warrant for violation of probation, and further, the kids would be placed in foster care until further notice."

He alleges, fearing they would arrest his fiancé and place the kids in foster care, he agreed to admit to the alleged burglaries. He alleges Detective Core then brought in a tape recorder and led Defendant through each burglary he wanted Defendant to confess to. He alleges upon inquiry, Detective Justin Massaro advised him his fiancé was brought in for questioning and then released just as they had promised.

He alleges his counsel was ineffective for failing to investigate and file a pretrial motion to suppress his confession and physical evidence based on his illegal detention, post-*Miranda* violation, and the illegal search and seizure. He alleges he advised his counsel of the incident that led to his arrest and what transpired during his interrogation. However, he alleges his counsel Mr. Scriven advised him it appeared he did not have any defenses in that area.

He alleges he advised his counsel that he was never read his *Miranda* rights prior to Detective Core placing him in handcuffs and never advised of the probable cause for his detention. He alleges Detective Core searched his truck without his consent. He alleges he asked his counsel to interview his fiancé Crystal Duran and call her as a witness at a suppression hearing as she would have testified that the police knocked on the door, rushed into the house, and searched personal items belonging to Defendant. He alleges she would have also testified that she did not consent to the police searching Defendant's personal drawers. However, he alleges Mr. Scriven concluded that she would not be a credible witness due to her prior criminal [history.] Nonetheless, Defendant alleges her testimony would have been germane to Defendant's defense that police conducted an unlawful search of his home and his fiancé could not consent to the search of his drawers.

He alleges had his counsel filed a motion to suppress, the Court would have been required to make a credibility determination regarding whether his confession and the evidence obtained were the result of Fourth Amendment violations. He alleges but

for counsel's unprofessional errors, he would not have pled guilty and would have insisted on going to trial.

In its August 27, 2015, order, the Court found Defendant's allegations were facially sufficient and could not be conclusively refuted from the record. Therefore, the Court ordered the State to respond to this claim.

In its response, the State asserted while it did not concede any error on the part of Defendant's counsel, a review of the motion, files, and records in this case did not conclusively refute Defendant's allegations. The State further asserted because this claim involved attorney/client communications and could not be refuted by the record, this claim should be addressed at an evidentiary hearing. After reviewing the allegations, the State's response, the court files, and the record, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the evidentiary hearing, the Court allowed Defendant's postconviction counsel to amend claim one to include that Mr. Scriven should have filed a motion to suppress based on Defendant's inebriation. At the evidentiary hearing, Defendant's mother Teresa Ann Benitez testified that at about four o'clock in the afternoon on the day her son was arrested, she received a call from his fiancé that they needed to pick up the kids because he had been arrested and they were going to take her down to the police station to question her. She admitted to knowing that his fiancé Crystal had a warrant out for her arrest. She testified she and her husband went to the house to pick up the four kids. She testified the house was a mess and looked like people had been going through a bunch of stuff. She testified that later that night, around six or seven in the evening, a police officer or detective drove Crystal back to their house.

She admitted to assisting Defendant in obtaining attorney Bryant Scriven. She admitted to talking to Mr. Scriven about the fact that Defendant had confessed to law enforcement the day he was arrested, including the possibility of trying to get that statement thrown out or found inadmissible. She testified Mr. Scriven kept telling her he would do it, but gave her an excuse. She testified they discussed the fact that Defendant was intoxicated when he gave these statements. On cross-examination, Ms. Benitez admitted she discussed with Mr. Scriven the issue of Defendant being intoxicated based upon police reports he had received.

At the same hearing, Hillsborough County Sheriff's Detective Ronald Core admitted he was trained regarding when the giving of *Miranda* warnings to suspects in criminal investigations would be appropriate and important and the drafting of police reports. Specifically, he admitted he was taught to include all important facts when writing those reports because others may rely on the report later or he may be looking at the report later down the road to try to refresh his recollection. He admitted he was taught that the State Attorney's Office would be given a copy of the report and would rely on that in preparing their case. He testified he included the pertinent information to the case in his report.

When asked to explain how this case began and how that day panned out in the beginning, he responded as follows:

> [Core:]          There had been a number of burglaries in the Apollo Beach/Ruskin Area. The burglaries appeared to be related. The targets of the burglaries were safes or high-end jewelry taken from sliding glass — unlocked sliding glass doors or trying to get into the house that way. We suspected they were related, so we started kind of putting the case together and that's how we came to it.

When asked how he found out that Defendant might be involved, he responded, "[w]e didn't — we didn't have the name. What we had was the description of a truck that was seen leaving the scene of several of the burglaries. It was described as a white, pickup truck. It had a nautical logo on it and the tailgate was rusted out." He testified they set up surveillance in the Apollo Beach area and he ended up following that truck into Bimini Bay, a subdivision across from Apollo Beach Elementary.

He denied that the truck was registered under Defendant's name. He testified he approached the truck, but he did not know who was driving. He testified Defendant was detained as a result of that incident and further elaborated as follows:

> [Core:]          I approached the car. The car pulled into an empty lot beside a house. The drive[r] [ ] sat in the car for several minutes. I

> pulled up. I drive a black, unmarked Chevy Impala. I turn on the lights. I approached the car. I had a badge around my neck much like I do now. I knocked on the window. Mr. Zadravec opened the door and I could detect a strong odor of marijuana coming from the car.

He testified when Defendant stepped out of the car, he could see a bag of marijuana on the front seat along with a bag that eventually was determined to be jewelry.

He testified that after he recovered the bag of marijuana, the cash, and the jewelry, he read him his *Miranda* rights. He testified he did not get Defendant's consent to search the vehicle because he searched the vehicle based on his arrest and what he found in the car. He admitted that at the time he searched the vehicle, Defendant was under arrest for the marijuana, but not read his *Miranda* rights until after the search. He testified he did not believe he recorded when he gave him his *Miranda* rights.

He testified that after being read his *Miranda* rights, Defendant admitted the marijuana was his and the jewelry was stolen from a burglary on the previous day. He further testified as follows:

[Core:]          Once we got to district four, once he made those statements[,] he was transported to our district four office and yes, I had my *Miranda* card, I reconfirmed that I read him *Miranda* from the card and asked if he still wished to speak with me. He said he did not want me to read his *Miranda* rights to him again and that yes, he would agree to speak with me.

He denied noticing anything about Defendant that would indicate he was intoxicated.

He testified that after Defendant was transported to the sheriff's office, he was interviewed twice throughout the day and those interviews were recorded. He testified he did not recall Defendant making any incriminating statements that were off the record. He testified, "I read him his *Miranda* rights on scene. He agreed to speak with me. I asked if you wished me to read them again, he said no."

He admitted that during the first interview, Defendant admitted to committing several burglaries and they went through five cases. He testified Defendant stated he committed the burglaries because he had developed a severe drug problem. He testified two of the five burglaries had quite a bit of high-end jewelry. He did not recall whether items were found at the house after it was searched because he did not have much to do with the search of the house.

When asked if members of law enforcement, including himself[,] threatened Defendant and used his drug problem as a way to bargain with him to confess, he responded, "I never threatened him, no. We did speak about his drug problem and the fact that he probably needed help for it." He further testified that if he wanted help for his drug problem, they probably told him that is what they were there for. A copy of the two videotaped interviews was admitted into evidence as Defense exhibit 1.

On cross-examination, Detective Core admitted that after he detected the odor of marijuana, he removed Defendant from the vehicle, detained him, handcuffed him, and he was not allowed to go back into his vehicle. However, he denied that Defendant exhibited any signs of being under the influence of drugs or alcohol and denied noting any signs of impairment with Defendant.

He testified that at the district office, he had the *Miranda* card and asked him if he wanted him to re-read him his *Miranda* rights and Defendant stated, "no." He testified such is reflected on the videotaped interrogation and Detective Todd Schrock was present. He denied that Defendant showed any signs of impairment at any point during the interview[,] and he was able to tie him to each of the burglary cases. He testified Defendant admitted to being involved in the burglaries and could identify items that were stolen in each case. On redirect examination, Detective Core admitted that the only thing that tied Defendant to the burglaries was his confession and the jewelry found.

At the same hearing, Hillsborough County Sheriff's Office Detective Daniel Johnson testified he was asked to go to Defendant's home with Corporal Jeff Harris and look for stolen property. He admitted he was advised that Defendant had given some sort of consent ahead of time. He testified Defendant's fiancé gave consent to search the house. He testified the fiancé gave him a bag of jewelry. He admitted he and Corporal Harris

went back to the residence a second time and found the televisions.

On cross-examination, Detective Johnson admitted to coming into contact with Defendant's fiancé when he arrived at the home, but denied recalling anybody having to remove her from the entryway to the doorway and denied recalling her objecting to law enforcement being present at the home.

Hillsborough County Sheriff's Office Detective Justin Massaro testified there were two investigations he had involving Defendant. He testified he did not recall being present when an official interrogation or interview was going on. He testified he did not recall any threats being made. When asked if Defendant appeared to be intoxicated at that time, he testified, "I didn't have a direct dealing with him, but from the little bit that I did see, I didn't observe any signs of impairment." He testified he was not made aware of any dealings involving the fiancé.

Hillsborough County Sheriff's Office Sergeant Alton L. McCullah II testified and when asked about his involvement in this case, he responded as follows:

> [McCullah:]     I run the intelligence unit so we are tasked, once a description of the suspect vehicle was found we were [ ] tasked — my guys were tasked with doing surveillance in the Apollo Beach area looking for the vehicle and I responded to a traffic stop or contact with Mr. Zadravec after Detective Core [and] a couple of my guys had found him near a house I believe on the 12th or 13th.

He testified he accompanied Sergeant Labarge and Corporal Harris to the jewelry store or pawnshop that afternoon or that evening. He denied having any involvement with the search of Defendant's home.

He testified he did not believe he was present when Defendant confessed to the burglaries. When asked if he was aware that Defendant had a drug problem, he testified, "[l]ater on after editing some of the reports I know that he — I guess there was some — some narcotics found inside the truck." When asked whether he had enough of a conversation with Defendant to have an opinion about whether or not he would be impaired, he responded, "I remember helping someone take him to the

restroom because two of us go. I don't — I don't remember thinking that he was high or inebriated at that time."

At the hearing, Defendant testified he entered an open plea to five cases and Mr. Bryant Scriven represented him. He testified he was arrested March 12th. He testified that that morning he had smoked marijuana, was under the influence of cocaine, and popped a few roxies. He admitted to having an addiction to drugs, including roxies and cocaine. When asked what he was doing sitting in his truck, he responded as follows:

[Zadravec:]    Actually I had been there for an hour. I had cleaned the pool and then I was just sitting in my truck barely getting ready to go — I was filling out paperwork and I was going to go to my next pool and at that moment I was actually rolling up a blunt to go to my next pool.

. . .

Well, I happened to notice — because at the — the yard I was parked in I was about 20 feet off the street. I was right next to where the pool entrance is at in the back yard. There's no screen. It's a big house and an empty lot. And I happened to be rolling it and I looked in the — the side view mirror and I seen somebody walking up the side of the house. I have never met the person that owns the house, so, you know, I thought maybe it was the owner of the house. So I went ahead and wrapped it up in the paper and stuffed it underneath the seat and then I opened the door to see who it was. As I opened the door and I looked — and I looked back I seen a detective with the — you know, the badge, detective badge hanging out and I said — and I just froze for a minute and he told me, Nicholas Zadravec and I said, yes, sir, and he said wait right there.

. . .

14

> Well, I sat — I turned around in the truck and I just kind of start panicking. So I had cocaine on me. I put it in my Big Gulp cup and I stirred it to the bottom of the cup and then after that there was no marijuana inside, so I just — you know I was kind of just thinking that why were they coming up on me and stuff like. And at that time I looked, you know, to the back of me and I seen a bunch of cars pulling up and Detective Core was walking back towards the truck.

He testified he stuffed the marijuana under the seat, stuck the baggie of cocaine in the Big Gulp cup, and popped two more pills.

He denied that the marijuana was visible at all. When asked what happened next, he testified as follows:

> [Zadravec:] Detective Core was coming back as they were pulling up and he asked me to step out [of] the vehicle and then he told me to place my hands behind my back so he put cuffs on me and then he moved me from my vehicle to the front of — like an unmarked car had pulled up behind me and he moved me to the hood of that and at that time he went away to go search my truck. And the two — I guess somebody identified themselves as the lieutenant and the sergeant from the Hillsborough County Sheriff's Office, they started asking me questions. They told me, we know you're a drug addict. We know you've been doing burglaries in this area. If you just tell us everything we can help you.

He denied that Detective Core asked him for consent to search his truck, denied that he told him he smelled marijuana, and denied that he told him he was being investigated for burglaries in the area. He denied that he was read his *Miranda* rights after being handcuffed and moved to the other car.

15

He testified he told the officers he did not know what they were talking about, and Detective Core grabbed the baggie of marijuana and said we'll just arrest you for this. He testified then Detective Core found the jewelry, the drugs started kicking in, he had a panic attack and started making incriminating statements. However, he denied being read his *Miranda* rights at that time. He admitted Detective Core found some money, marijuana, and jewelry, but did not recall whether he was ever read his *Miranda* rights.

He testified he was then taken to the sheriff's office and they put him in a holding cell. He testified prior to the recording, he was told to come clean with everything and they would get him help for his drug problem. He admitted that during the interview, he confessed to three of the smaller burglaries, provided slight details about how he entered the houses, explained the items he took, and what he did with them afterwards. He testified he told them he committed the burglaries because of his drug problem. He denied admitting to the two bigger burglaries.

He testified he was then placed back into the holding cell and taken out again and asked about an engagement ring he got for his fiancé. He testified he called his fiancé Crystal and told her that an officer was going to go to the house and she was to hand the officer the engagement ring. He testified he only consented for them to go and get the ring. He admitted he told police there was nothing else at the house besides the ring, but also admitted that they found jewelry in his house in a personal drawer.

He testified after they obtained the items from his house, they questioned him again and told him that if he did not admit to what they wanted him to admit to, they were going to arrest his fiancé and put his kids in foster care. He testified he confessed to the bigger burglaries because he did not want Crystal to get arrested or the kids to go to foster care. He testified they provided him with the facts of the bigger burglaries. He testified that during the second videotaped interview, they asked him about some televisions that he had at the house, but he told them he had purchased them on the street.

He testified his mother hired Mr. Scriven and he explained the sequence of events to him. When asked about Mr. Scriven's reaction, he responded as follows:

[Zadravec:]     He told me because of my confession that he had no defense in that area. He said

that there was no such thing as psychological coercion. That he said there was only — that only physical coercion exists. That they would have to [ ] beat me up out back for — and get a confession out of me like that and that would be something that you could file a motion to suppress for.

He testified that from the start of their initial visit, Mr. Scriven told him he was going to have to enter an open plea because of his confession. When asked if he talked to him about filing a motion to suppress, he responded as follows:

[Zadravec:]     Yes, ma'am, I brought it up. I had talked to somebody in my dorm that was — that [ ] knew something about the law and he told me why don't you ask him to try to file a motion to suppress your confession and you'll — under the fact that it was coercion, this and that and he told me that there was — that he didn't have no — that we didn't have nothing against that. He didn't have no defense against that.

He admitted that Mr. Scriven told him that his confession to all five burglaries was recorded, but he never had a chance to watch it with Mr. Scriven. He admitted Mr. Scriven was aware of his drug problem, including the drugs he had taken on the day law enforcement spoke to him at his car. He admitted he was heavily impaired when he spoke to law enforcement and testified that he was booked into the county jail and put through detox for two weeks. He testified he was not one hundred percent sure that he was read his *Miranda* rights. He testified had his counsel filed the motion to suppress, he would have gone to trial. He admitted he believed his confession and the evidence they received as a result of his confession was the main or only pieces of evidence in his case.

Mr. Bryant Scriven testified he represented Defendant on several burglary charges in reference to five cases. He admitted he discussed with Defendant the maximum penalties he was facing for each of the cases. He testified he thought the State had a case that they could prove against him. He denied telling Defendant that he had to enter an open plea at their initial visit. He admitted to gathering discovery on each case and denied

that Defendant ever told him that he wanted to go to trial on any of these cases. He admitted Defendant ultimately decided to enter an open plea to the court and believed it was in Defendant's best interest.

He denied that Defendant ever told him he was not read his *Miranda* rights. He admitted to fully reviewing the discovery. When asked if he saw any issues which he believed formed the basis for a viable motion to suppress, he responded as follows:

> [Scriven:] No, I didn't. We actually did review or talk about a motion to suppress as that would, you know — you know, given the facts of the case that would be the only way — or the only legitimate defense would be to get — get his confession or statements suppressed. So we reviewed that at length. After discussion with him, you know, we concluded that that would not be in his best interest.

He admitted Defendant's interrogation was videotaped.

However, he denied recalling that Defendant told him that he had consumed drugs immediately prior to his arrest or that he was under the influence of drugs during the interview and that he did not remember what he had said. He testified he did not remember having a conversation with Defendant's mother that he was going to file a motion to suppress based on Defendant's intoxication at the time of his interview. He testified he believed that Defendant implicated himself in several of the burglaries and then later implicated himself in some additional ones.

He admitted that after he was interviewed, law enforcement searched Defendant's home. He admitted they found items from several of the burglaries in his home. He did not recall Defendant telling him that his fiancé did not consent to the search of the home. He testified he thought the fiancé said she did consent to the search of the home, but did not remember her saying she did not agree to allow them in. He admitted that if he had thought after his review of the evidence that there was a viable motion to suppress, he would have filed it. He admitted to discussing with Defendant at length why he was not able to file a motion to suppress his confessions.

On cross-examination, Mr. Scriven admitted he believed Defendant's confession and the jewelry they found were largely the case. He testified there was no DNA or fingerprint evidence because the results were inconclusive. He testified he did not recall Defendant telling him he would not go to trial, but he did not remember them having a lot of conversation about trial. He further testified, "I think he indicated pretty early on that he did not want to go to trial, but I don't remember any real follow-up conversations about that."

He admitted they discussed the possibility of a motion to suppress. When asked whether a motion to suppress would have been in his best interest, he responded, "[p]otentially if we had a — you know, if I felt we had a reasonable chance of being, you know, successful, but, you know, in the event that we were not successful I think it possibly could have backfired." He testified Defendant never told him that they did not read him his *Miranda* rights. He did not recall whether Defendant watched the video.

He admitted he was aware that Defendant had a drug problem leading to this incident. He recalled them discussing his ongoing drug usage[ ] but did not remember any specific conversation regarding his drug use on that day. He testified he spoke to Defendant's family about a motion to suppress[ ] but did not recall his mom questioning how they could use his statement against him if it was made while he was intoxicated. He did not recall whether he was aware that Crystal had a warrant out for her arrest.

On redirect examination, Mr. Scriven admitted Defendant's confessions were not the only evidence as there were also transactions that occurred with Bob from Bob's Jewelry. He also admitted there were witnesses that provided the description of the truck that Defendant drove. Lastly, he admitted there was one neighbor of one of the victims that could testify that a person driving the truck that fit the description as well as an individual that fit the description of Defendant was seen coming out of the backyard of one of the victims.

At the April 20, 2016, evidentiary hearing, Crystal Duran testified she first learned that Defendant was in custody on that day when the detectives arrived at her house and were banging on her door waking up her children. She testified they did not ask her for anything, and just came in. She did not remember anybody calling her and telling her to bring any jewelry.

She described what happened when the officers arrived at her house. She testified she did not give them consent to look around and they did not ask if they could go in and search her house. She testified, "[t]hey did come into the house. Like I said, they were looking around and then they just said they would be back to take me in for questioning. It didn't take long. They left and they came back. By then my in-laws were already there to pick up the children when they took me in."

She did testify they took the ring that Defendant gave to her. She denied being present when they found the jewelry in the house. She testified when they returned a second time to the house, they took some televisions. She admitted they took her in for questioning and she further testified, "[t]hey did mention to me that they knew that he was on something that day or either he was high or, you know, maybe he went to work high or whatever, but they did say that he was acting nervous and he wasn't being himself. It was probably due to the fact that, you know, he was on some drug or something."

On cross-examination, she admitted Defendant called her and told her to cooperate with the deputies because he was scared they were threatening their children. However, she did not recall Defendant telling her to give them a bag of jewelry. She testified she did not give them anything. She also denied that Defendant told her to give them her engagement ring. She admitted that the first time the detectives were there and they were looking around her house she was preoccupied with caring for her children.

After reviewing the allegations, the testimony, evidence, and arguments presented at the April 18, 2016, and April 20, 2016, evidentiary hearing, all written arguments, the court files, and the record, the Court finds Detective Ronald Core's testimony, Detective Daniel Johnson's testimony, Detective Justin Massaro's testimony, Sergeant McCullah's testimony, and Bryant Scriven's testimony more credible than that of Defendant, Teresa Ann Benitez, and Crystal Duran. Therefore, the Court finds Detective Ronald Core detained Defendant because when he approached Defendant, he detected an odor of marijuana. The Court finds when Defendant exited the vehicle, Detective Core saw in plain view a bag of marijuana on the front seat and a bag determined to be jewelry. The Court finds Detective Core read Defendant his *Miranda* rights at the scene and Defendant admitted the marijuana was his and the

jewelry was stolen from a burglary on the previous day. The Court finds Detective Core did not notice any indication that Defendant was intoxicated or impaired. The Court finds Detective Core did not threaten Defendant to induce him to make incriminating statements.

The Court finds based on Detective Johnson's testimony, Crystal gave them consent to search the house and Crystal gave him a bag of jewelry. The Court finds based on Detective Massaro's testimony, there were no threats made to Defendant and he did not observe any sign of impairment. The Court further finds based on Sergeant McCullah's testimony, he did not remember thinking Defendant was high or inebriated at that time. After reviewing Defense exhibit 1, the Court finds Defendant was not slurring his words and did not appear to be intoxicated. The Court further finds Defendant assured the officer he did not need the *Miranda* warnings read to him again.

The Court finds based on Mr. Bryant Scriven's testimony, Defendant never told him that he was not read his *Miranda* rights, that he ingested drugs immediately prior to his arrest, that he was under the influence of drugs during the interview, or that he did not remember what he had said. The Court finds after reviewing all discovery and discussing the case with Defendant, Mr. Scriven did not believe he had a good faith basis to file a viable motion to suppress or that it would be in Defendant's best interest to file the motion. The Court finds Mr. Scriven did not tell Defendant or any of his family members that he was going to file the alleged motion to suppress. The Court finds Defendant never told Mr. Scriven that his fiancé did not consent to the search of the home. Consequently, the Court finds Defendant failed to prove that Mr. Scriven acted deficiently or any resulting prejudice when Mr. Scriven thoroughly reviewed discovery and investigated the cases, including conducting depositions and getting Defendant's version of the events, and based on his investigation properly determined that he could not in good faith file a viable motion to suppress. The Court further finds even if Mr. Scriven had filed the alleged motion to suppress, based on law enforcement's testimony and the recorded interviews, the alleged motion to suppress would have been denied. As such, no relief is warranted upon [the claim].

The post-conviction court found Detective Core, Detective Johnson, Detective Massaro, Sergeant McCullah, and trial counsel more credible than Zadravec, his mother,

and his fiancé at the evidentiary hearing, and a state court's credibility determination receives deference in federal court. *Raheem v. GDCP Warden*, 995 F.3d 895, 929 (11th Cir. 2021) ("'Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.'") (citation omitted).

### Ground One

Zadravec asserts that trial counsel was ineffective for not moving to suppress his confession to police. (Doc. 1 at 5–8) He contends that police interrogated him without advising him of his constitutional rights, he could not have waived those rights because he was under the influence of drugs, and police threatened and coerced him to secure his confession. (Doc. 1 at 5–8) The post-conviction court accurately summarized the testimony by Detective Core, Detective Massaro, Sergeant McCullah, and trial counsel concerning the confession. (Doc. 11-5 at 23–32, 37–40, 55–64, 104–06, 114–16)

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966), holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Before any questioning, police must inform a defendant that he has the right to remain silent, his statement can be used as evidence against him, and he has the right to have a retained or appointed attorney present. *Miranda*, 384 U.S. at 444–45. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. If the defendant indicates either that he wants to consult an attorney or that he does not want to participate in an interrogation, police may not question him. *Miranda*, 384 U.S. at 444–45.

The detective handcuffed and arrested Zadravec and therefore could not interrogate him without advising him of his *Miranda* rights. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."). At the scene of the arrest the detective advised Zadravec of his rights before questioning him about the marijuana and the jewelry. (Doc. 11-5 at 28) *Miranda*, 384 U.S. at 444–45.

At the police station on the same day before a second interview, the detective asked Zadravec whether he wanted the detective to repeat his *Miranda* rights. (Doc. 11-5 at 29, 39–40) At the beginning of the recorded interrogation, the detective pulled out a card and asked Zadravec, "Alright, I already read you your rights on this card. Would you like me to read them to you again?" (Doc. 12, Disc 2) When Zadravec said no, the detective asked, "Are you sure? Do you understand everything on them? Do you still want to talk to us?" (Doc. 12, Disc 2) *Miranda* did not require the detective to repeat the rights before further interrogating Zadravec. *Ballard v. Johnson*, 821 F.2d 568, 571–72 (11th Cir. 1987) ("Ballard's interrogation occurred on the same day and the only break in his questioning came as a result of his transportation from Bayou LaBatre to Mobile. He acknowledged to the district attorney that he had been advised of his rights earlier in the day."); *Jarrell v. Balkcom*, 735 F.2d 1242, 1254 (11th Cir. 1984) ("Under the circumstances of this case, we do not view a confession given less than four hours after the issuance of *Miranda* warnings inadmissible because of the failure to reissue the warnings.").

Lastly, Detective Core testified that Zadravec did not appear intoxicated when the detective advised Zadravec of his rights or when he further interrogated Zadravec at the police

station. (Doc. 11-5 at 29, 39–40) Other police officers who saw Zadravec at the police station testified that he did not appear intoxicated. (Doc. 11-5 at 57, 64) Detective Core denied either threatening Zadravec or his fiancé or coercing Zadravec with his drug addiction during the interrogation. (Doc. 11-5 at 36, 57, 63) Both recorded interrogations confirm that Zadravec spoke intelligently and coherently. (Doc. 12, Discs 1 and 2) The recorded interrogations further confirm that the detectives neither threatened Zadravec nor coerced him, and Zadravec brought up his drug addiction to explain why he had committed the burglaries. (Doc. 12, Disc 2) *Colorado v. Spring*, 479 U.S. 564, 574 (1987) ("Absent evidence that Spring's 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct, his waiver of his Fifth Amendment privilege was voluntary under this Court's decision in *Miranda*.") (citations omitted).

There has been no showing that if trial counsel had moved to suppress the confession, the trial court would have granted the motion. Because reasonably competent counsel would not have filed the futile motion, the state court did not unreasonably apply *Strickland*. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Zadravec argues that the state court unreasonably determined facts under 28 U.S.C. § 2254(d)(2). He first argues that the state court unreasonably determined that trial counsel investigated facts concerning his statements. (Doc. 3 at 17) He contends that trial counsel incorrectly believed that the recorded interrogations showed Zadravec confess to all five burglaries. (Doc. 3 at 17) He contends the recording only depicts Zadravec's confession to three of the five burglaries and does not depict his confession to the "most incriminating and

damaging case against [him]." (Doc. 3 at 17) He concludes that trial counsel did not watch the videos and misadvised Zadravec that evidence corroborated his confessions to police. (Doc. 3 at 17)

The record supports the state court's conclusion that trial counsel investigated the suppression issue and did not misadvise Zadravec concerning the evidence. (Doc. 11-4 at 23) At the evidentiary hearing, trial counsel testified that he reviewed the discovery and deposed the victims. (Doc. 11-5 at 104–09) Also, trial counsel confirmed that he watched the recorded interrogations (Doc. 11-5 at 114):

> [3.850 counsel:]   So in these conversations where you talk about a motion to suppress, it's your testimony that he never advised you that he was not read his *Miranda* when they first spoke to him at the scene of his arrest?
>
> [Trial counsel:]   I don't recall that at all. And, in fact, I remember — we watched the video and I think it was pretty clear on the video that was mentioned in the video if I'm not mistaken. Again, I haven't watched it in a couple of years, but I do remember them discussing *Miranda*.

Also, trial counsel testified that Zadravec had immediately confessed to several burglaries and later confessed to additional burglaries (Doc. 11-5 at 105):

> [Prosecutor:]   Okay. During the interview with law enforcement, initially did your client implicate himself in at least three of the burglaries when he was interviewed by detectives?
>
> [Trial counsel:]   And again, I haven't watched the video, but I'm — I believe so. I — I believe that this is a situation where he almost immediately implicated himself in several of the burglaries and then later, you know,

implicated himself in — in some additional ones.

Detective Core refreshed his recollection with his report and testified about the evidence that supported each of the five burglaries:

| [Prosecutor:] | . . . It would be court case number 13-CF-3676. It would be your agency report number 2012-487721. |
|---|---|
| [Detective:] | Yes, ma'am. |
| [Prosecutor:] | Did you address that case with the defendant? |
| [Detective:] | I did. |
| [Prosecutor:] | Okay. And did he admit to any involvement in that case? |
| [Detective:] | Yes, he did. |
| [Prosecutor:] | And was he able to identify items that were stolen from the home? |
| [Detective:] | Yes, he was. |
| [Prosecutor:] | Okay. And do you know if those items were recovered? |
| [Detective:] | I don't know that any of those were recovered. That was the first burglary he indicated he did and he stated that he sold that jewelry to Bob's Jewelry in small increments because that was one of the ones where he got a lot of jewelry. |
| [Prosecutor:] | Okay. |
| [Detective:] | A lot of high-end items. |
| [Prosecutor:] | Okay. And any items in particular stand out? |

| | |
|---|---|
| [Detective:] | I believe there was a ring, a very large carat diamond ring. |
| [Prosecutor:] | And that was not recovered? |
| [Detective:] | Correct. |

(Doc. 11-5 at 40–41)

| | |
|---|---|
| [Prosecutor:] | Okay. And there was — it would be the court case number 13-CF-3733, agency report number 2012-524865, did you discuss that case with the defendant? |
| [Detective:] | We did. |
| [Prosecutor:] | Okay. And did he make admissions to being involved in that burglary? |
| [Detective:] | He did. |
| [Prosecutor:] | Okay. And do you recall what items were taken from that home? |
| [Detective:] | Report indicates that he beat open the safe in the garage and took jewelry and some antique guns. |
| [Prosecutor:] | Okay. And were there any unusual facts about the case in particular dealing with the safe? |
| [Detective:] | He did make the comment that he beat it open and we were at the scene and that safe was definitely beat open. |

(Doc. 11-5 at 41–42)

| | |
|---|---|
| [Prosecutor:] | Okay. Now specifically referring to court case number 13-CF-3679. It would be Hillsborough County Sheriff's Office agency report number 2013-142163, did Mr. Zadravec make any admissions in that burglary case? |
| [Detective:] | Yes, he did. |

[Prosecutor:]          And specifically what did he admit to?

[Detective:]          He admitted to breaking into the house and taking jewelry from the safe. And, in fact, in this case he said he saw several guns in the safe and decided to leave them alone because he had actually never gotten paid for the guns he had taken from the earlier burglary that we just discussed.

(Doc. 11-5 at 42)

[Prosecutor:]          Okay. And in reference to court case number 13-CF-3678, your agency report number 2013-71966, did Mr. Zadravec make any admissions in reference to that burglary?

[Detective:]          He did.

[Prosecutor:]          And did he specifically admit to taking items from that home?

[Detective:]          He admitted to knowing that the resident of the home sold marijuana and he admitted to taking a safe with the intent to take the drugs from the home and I believe Mr. Zadravec said he got about a quarter pound of marijuana from the safe and then dumped the safe in a canal.

(Doc. 11-5 at 42–43)

[Prosecutor:]          And in reference to court case number 13-CF-3677, your agency report number 2012-598535, did Mr. Zadravec make any admissions in reference to that burglary specifically?

[Detective:]          Yes, he did.

[Prosecutor:]          Okay. And what did he indicate his involvement was?

[Detective:]   He said that he waited out front of her home and watched her leave. He then walked across the street into the back of her home. He found a door that was unlocked, went inside and found $500 cash in her drawer. He said this one he remembered because when he left the residence he was confronted outside by a homeowner, but he just ignored the homeowner and walked away.

(Doc. 11-5 at 43)

Even if police did not record Zadravec's confession to all five burglaries, the detective could have testified at trial about Zadravec's unrecorded confessions. Fed. R. Evid. 801(d)(2)(A). The owner of a jewelry store told police that Zadravec had sold him a diamond ring, witnesses identified Zadravec's truck, another witness identified an individual that fit Zadravec's description leaving one of the burglarized houses, and police found items from the burglaries at Zadravec's home. (Doc. 11-5 at 105–06, 119–20) Trial counsel did not misadvise Zadravec that evidence corroborated his confessions.

Zadravec further argues that the state court unreasonably determined that Detective Core and trial counsel were more credible than Zadravec. (Doc. 3 at 17) He contends that Detective Core testified that he recorded two interviews with Zadravec about all five burglaries and the videotaped interrogations show that he recorded one interview about only three burglaries. (Doc. 3 at 18)

Detective Core testified that he first interrogated Zadravec at the scene of his arrest. The detective advised Zadravec of his *Miranda* rights and asked him about the marijuana and the jewelry in his car. (Doc. 11-5 at 28–30) The detective did not record the warning or the interrogation. (Doc. 11-5 at 28–30) The detective testified that he interrogated Zadravec

two more times in an interview room at the police station, recorded both interrogations, and discussed all five burglaries. (Doc. 11-5 at 30–31, 33)

Later in his testimony, the detective clarified his statements concerning the recorded interrogations (Doc. 11-5 at 37):

| | |
|---|---|
| [3.850 counsel:] | . . . And the second video I believe that we have, is that the second conversation that you had with Mr. Zadravec? It was a shorter video. It was an interview about TVs that were taken from his home. |
| [Detective:] | I believe that was Detective Johnson on that interview. |
| [3.850 counsel:] | That was Detective Johnson. Okay. |
| . . . | |
| [3.850 counsel:] | And I don't believe that you made these copies. I believe that the State Attorney's Office did. Would you look at those, please? Were there two videos that you provided to the State Attorney's Office about Mr. Zadravec's case? |
| [Detective:] | Yes. |
| [3.850 counsel:] | Okay. And were they both the only video interrogations that you had of him from this? |
| [Detective:] | That's all I had, yes. |

The detective testified that his report showed that he had discussed all five burglaries with Zadravec. (Doc. 11-5 at 33) The detective had reviewed the recorded interrogations more recently because the interviews had occurred three years before but acknowledged, "[I]t's kind of hard to hear. Our audio wasn't the best in that interview room during the

time, so I have to rely on what my report indicates." (Doc. 11-5 at 31–32) He further testified

about any discrepancy between his report and the recordings (Doc. 11-5 at 33–34):

| [3.850 counsel:] | So if the video showed something else, would you rely on the video to show what the actual interview [was]? |
|---|---|
| [Detective:] | If I could understand the audio then that of course is the best evidence, but I go by what's on my report. |

The post-conviction court reviewed the recorded interrogations before ruling on the

claim. (Doc. 11-4 at 23) During the recorded interrogations, Zadravec confessed to three of

the five burglaries. (Doc. 12, Disc 2)

Because the detective clarified his misstatement concerning the two recorded

interrogations, the state court did not unreasonably conclude that the detective was credible.

Zadravec fails to offer clear and convincing evidence that rebuts that credibility finding.

28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Lastly, Zadravec asserts that the state court unreasonably determined that trial

counsel did not tell Zadravec or his family members that he was going to file a motion to

suppress. (Doc. 3 at 19) The post-conviction court concluded that the motion to suppress

would not have succeeded. (Doc. 11-4 at 23–24) Even if trial counsel told Zadravec and his

family that he would file a motion to suppress, the trial court would not have granted the

motion. Because the post-conviction court's denial of the claim did not turn on whether trial

counsel told Zadravec and his family that he would file a motion to suppress, Zadravec fails

to show how the post-conviction court's adjudication of the claim "resulted in a decision that

was **based on** an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding." 28 U.S.C. § 2254(d)(2) (bolding added). *Smith v. Duckworth*, 824

F.3d 1233, 1251 (10th Cir. 2016) ("Under § 2254(d)(2), 'an unreasonable determination of the facts does not, itself, necessitate relief.' Rather, a habeas petitioner must demonstrate that the state court's decision is "based on" — *i.e.*, "rests upon" — that unreasonable determination of the facts.") (citation omitted).

Even so, trial counsel testified about his discussions with Zadravec and his family concerning the motion to suppress as follows (Doc. 11-5 at 104–06):

| | |
|---|---|
| [Prosecutor:] | And after you reviewed the discovery did you see any issues in which you believed a motion to suppress would have been viable? |
| [Trial counsel:] | No, I didn't. We actually did review or talk about filing a motion to suppress as that would, you know — you know, given the facts of the case that would be the only way — or the only legitimate defense would be to get — get his confession or statements suppressed. So we reviewed that at length. After discussion with him, you know, we concluded that that would not be in his best interest. |
| [Prosecutor:] | Okay. Was the interrogation of your client videotaped? |
| [Trial counsel:] | It was. |
| [Prosecutor:] | Did he ever tell you that he had consumed drugs immediately prior to his arrest? |
| [Trial counsel:] | I don't recall that. |
| [Prosecutor:] | Did he ever tell you that he was under the influence of drugs during the interview and that he didn't really remember what he had said? |
| [Trial counsel:] | I don't recall him saying that or advising me of that, no. |

| | |
|---|---|
| [Prosecutor:] | Did you ever have a conversation with the defendant's mother that you were going to file a motion to suppress because he was intoxicated at the time of this interview? |
| [Trial counsel:] | I — I don't remember having that conversation, no. |
| . . . | |
| [Prosecutor:] | Did you discuss all of the issues as to why you were not able to file a motion to suppress his confessions with your client? |
| [Trial counsel:] | Yes, we discussed that at length. |

Trial counsel further testified on cross-examination about his discussion with Zadravec's family about a motion to suppress as follows (Doc. 11-5 at 115–16):

| | |
|---|---|
| [3.850 counsel:] | What about with his mother? You testified on direct that you don't remember having a conversation about [Zadravec's drug use on the day of the interrogation] as well. Did you ever have a conversation with his mom about his confession and [a] possibility trying to get it thrown out? |
| [Trial counsel:] | Yeah. Well, we had — I'm sure I discussed that with her. As to those grounds I don't recall having, you know, a specific conversation as to, you know, those grounds. |
| [3.850 counsel:] | Okay. |
| [Trial counsel:] | But I — I know I spoke to his family about, you know, a motion to suppress. |
| [3.850 counsel:] | Okay. And was one of the questions that his mom had, why they could use a statement against him that was made while he was intoxicated? So meaning, could they use a statement against him if it was made when he was impaired? |

[Trial counsel:]      I don't recall —

[3.850 counsel:]     Okay.

[Trial counsel:]      — that. I don't recall.

Zadravec argues that trial counsel's lack of recollection of the discussions did not rebut testimony by Zadravec and his mother that the discussions did occur. (Doc. 3 at 19) However, the state court reasonably inferred that, if trial counsel did not remember those discussions, the discussions never occurred. *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1340 (11th Cir. 2017) ("[T[he leap between 'I do not recall' and 'I gave no such instruction' is more than a reasonable inference."). Consequently, the state court did not unreasonably deny the claim.

Ground One is **DENIED**.

**Ground Two**

In Ground Two, Zadravec asserts that trial counsel was ineffective not moving to suppress evidence seized during unlawful and warrantless searches of both his car and his home. (Doc. 1 at 9–11)

**Search of Car**

Zadravec asserted in his post-conviction motion that trial counsel was ineffective for not moving to suppress the items seized in his car. (Doc. 11-3 at 34) However, the post-conviction court did not address the claim in the written order. (Doc. 11-4 at 22–24, 36–37) The post-conviction court's silent denial of the claim is an adjudication on the merits owed deference under 28 U.S.C. § 2254(d). *Johnson v. Williams*, 568 U.S. 289, 298 (2013)

("Although *Richter* itself concerned a state-court order that did not address any of the defendant's claims, we see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims.").

Detective Core testified that he saw a parked truck that matched the description of a white pickup truck with a nautical decal and a rusted-out tailgate seen leaving the scene of several recent burglaries in the area. (Doc. 11-5 at 23–24) The detective pulled up behind the truck, turned on his lights, and approached the truck with his badge around his neck. (Doc. 11-5 at 25) When he approached the truck and knocked on the window, Zadravec opened the door. (Doc. 11-5 at 24–25) The detective smelled a strong odor of marijuana coming from the car, observed a bag of marijuana on the front seat, and saw a second bag. (Doc. 11-5 at 25) The detective detained Zadravec and asked for identification. (Doc. 11-5 at 25–27) The detective arrested Zadravec for possessing marijuana, searched his car, seized the bag of marijuana, and found cash and jewelry in the second bag. (Doc. 11-5 at 25–27) The detective advised Zadravec of his *Miranda* rights, and after waiving his rights Zadravec told the detective that the marijuana belonged to him and the jewelry was proceeds of a burglary. (Doc. 11-5 at 27–29)

Because the truck matched the detailed description of the truck seen at the scene of the burglaries and was in the area where those burglaries had very recently occurred, the detective had reasonable suspicion to act on his on-the-beat identification and conduct a traffic stop. *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.").

Because the detective observed marijuana in plain view on the front seat of the truck, the detective had probable cause to arrest Zadravec. *United States v. Lightbourn*, 357 F. App'x 259, 265 (11th Cir. 2009) ("As Wever was patting down Lightbourn, he observed marijuana in plain view on Lightbourn's seat. At this point, Wever had probable cause to arrest Lightbourn for marijuana possession.").

Following the lawful arrest of Zadravec, the officer properly seized the marijuana in plain view and properly searched the truck for additional contraband. *Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."); *California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

Because the trial court would not have granted a motion to suppress the items in the truck, trial counsel was not ineffective and the state court did not unreasonably apply *Strickland*. *Pinkney*, 876 F.3d at 1297.

### Search of Home

The post-conviction court accurately summarized the testimony by Detective Johnson concerning the search of Zadravec's home. The detective testified that he and another police officer went to Zadravec's house after Zadravec had given "some sort of consent." (Doc. 11-5 at 47) The detective and the police officer met Zadravec's fiancé at the house and asked for consent to search the house. (Doc. 11-5 at 47–48) The detective testified, "Consent was asked to — was asked to search the house and it was given." (Doc. 11-5 at 48) Because

Zadravec's fiancé consented to the police's search of the house, the trial court would not have granted the motion to suppress the items seized from the house. *Fernandez v. California*, 571 U.S. 292, 294 (2014) (holding that consent to search by one occupant is valid even if a second occupant who is not physically present objects). Consequently, trial counsel was not ineffective and the state court did not unreasonably apply *Strickland*. *Pinkney*, 876 F.3d at 1297.

Zadravec argues that he and his fiancé's recollection of the events differed from the detective's recollection. (Doc. 3 at 22) However, the post-conviction court heard testimony by all three witnesses, observed their demeanor, and concluded that the detective was more credible than Zadravec and his fiancé. (Doc. 1104 at 22) Zadravec fails to present clear and convincing evidence that rebuts that credibility finding. 28 U.S.C. § 2254(e)(1). *Miller-El*, 537 U.S. at 340.

Ground Two is **DENIED**.

**Ground Three**

Zadravec asserts that his plea was neither knowing nor voluntary because of trial counsel's misadvice. (Doc. 1 at 12–13) He contends that, before he pled guilty, trial counsel told him that he had viewed his confessions on a videotape and described them as "very damaging." (Doc. 1 at 12) Zadravec never viewed the recorded confessions before he pled guilty and relied on trial counsel's advice that he should plead guilty without an agreement because of the recorded confessions. (Doc. 1 at 12) On post-conviction, Zadravec obtained a copy of the recorded confessions from the sheriff's office and discovered that the recordings show only "a small portion of the interviews and [his] recorded statement."

(Doc. 1 at 13) Zadravec contends that the recordings "did not reflect the most damaging portions of [his] statements that law enforcement reflected in their reports." (Doc. 1 at 13)

Zadravec concedes that he failed to exhaust his state remedies for this claim. (Doc. 1 at 14) He contends that he initially proceeded *pro se* on post-conviction, retained counsel after the time to raise the claim expired, and did not discover the factual basis of the claim until the evidentiary hearing on his other claims. (Doc. 1 at 14) He asserts that *Martinez v. Ryan*, 566 U.S. 1 (2012) permits review of the claim on federal habeas. (Doc. 1 at 14)

Because Zadravec did not raise this claim in either his post-conviction motion (Doc. 11-3 at 29–42, 152–58) or his brief on appeal (Doc. 11-6 at 45–68), the claim is unexhausted. *Boerckel*, 526 U.S. at 845. Because the state court would deny the claim as untimely and successive if Zadravec returned to state court to exhaust the claim, the claim is procedurally barred from federal review. Fla. R. Crim. P. 3.850(b), (h). *Snowden*, 135 F.3d at 736. To excuse the procedural bar, Zadravec must show cause and actual prejudice. *Maples*, 565 U.S. at 280.

"[W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)." *Martinez*, 566 U.S. at 14. "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate

that the claim has some merit." *Martinez*, 566 U.S. at 14. *Hittson v. GDCP Warden*, 759 F.3d 1210, 1270 (11th Cir. 2014) (comparing the "some merit" standard under *Martinez* with the standard for a preliminary review of a Section 2254 petition which requires summary dismissal "if it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief").

A Florida court requires a defendant to raise a post-conviction claim in a collateral proceeding. *Bruno v. State*, 807 So. 2d 55, 63 (Fla. 2001). Because Zadravec did not appeal his convictions and sentences, his judgment and sentence became final on February 27, 2014 and the time to file an ineffective assistance of counsel claim expired two years later on February 29, 2016. (Doc. 11-2 at 70, 84, 98) Fla. R. Crim. P. 3.850(b); Fla. R. App. P. 9.020(h) and 9.140(b)(3). *DePasquale v. State*, 257 So. 3d 505, 506 (Fla. 4th DCA 2018). The post-conviction court appointed Zadravec counsel for the evidentiary hearing on October 15, 2015. (Doc. 11-3 at 49, 59) Because the appointment occurred before the time to file a claim expired, Zadravec must show that appointed post-conviction counsel was ineffective for failing to raise the claim and the claim has "some merit." *Martinez*, 566 U.S. at 14.

*Strickland* applies to a claim that trial counsel deficiently performed before a guilty plea. *Hill*, 474 U.S. at 58. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017).

"[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed

and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984). "[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59.

Zadravec alleges that before he pled guilty trial counsel reviewed the prosecution's evidence, told Zadravec that police had recorded his confessions to all five burglaries, and the confessions were damaging. (Doc. 3 at 25) He contends that he never viewed the videotaped interrogations, relied on trial counsel's description of the evidence, and pled guilty. (Doc. 3 at 25) He contends that on post-conviction he learned for the first time that "the recorded statements did not exist." (Doc. 3 at 25) He was "shocked" because "[that evidence] had been a large basis for entering his plea in the first place." (Doc. 3 at 25)

At the evidentiary hearing, Zadravec testified that in an interrogation room at the police station he confessed to three smaller burglaries but denied committing two larger burglaries. (Doc. 11-5 at 76–78) The detective returned Zadravec to a holding cell, and police searched his home and seized jewelry in a drawer in the bathroom. (Doc. 11-5 at 78–80) The detective placed the jewelry seized from Zadravec's home on tables in a conference room and further interrogated Zadravec about the two larger burglaries. (Doc. 11-5 at 81–84) Zadravec confessed to the two larger burglaries but claimed that the detective threatened and coerced him. (Doc. 11-5 at 84, 96) Zadravec claims he believed that the detective recorded the three confessions in the interrogation room and the two confessions in the conference room because trial counsel told him that police recorded all of them. (Doc.

11-5 at 84, 87) Zadravec denied watching the videotaped interrogation before pleading guilty. (Doc. 11-5 at 76, 87)

At the evidentiary hearing, Zadravec's post-conviction counsel did not ask trial counsel whether he told Zadravec that the videotaped interrogation contained all five confessions. Trial counsel testified that he reviewed the discovery in the burglary cases, including the videotaped interrogation. (Doc. 11-5 at 104, 114) Trial counsel did not remember whether he watched the video with Zadravec. (Doc. 11-5 at 115)

Even if trial counsel misadvised Zadravec that the videotaped interrogation contained all five confessions, the record refutes that Zadravec "would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Factually, his claim would have been difficult to assert without implicating himself in other charges before the jury. Moreover, the risk of substantially greater penalties undermines his assertion that he would have insisted on proceeding to trial.

Specifically, before trial, Zadravec knew that he had confessed in front of the detective to the two larger burglaries. Even if the detective had not recorded those confessions, Zadravec knew that the detective could have testified about those confessions at trial. Fed. R. Evid. 801(d)(2)(A). While the failure to record the two confessions could raise doubt about the credibility of the detective, Zadravec would have had to testify at trial to rebut the detective's testimony concerning the substance of those unrecorded confessions. If Zadravec denied that he committed the burglaries on direct examination, he could open the door to the prosecutor's impeachment on cross-examination with the other burglaries to which he did confess. *Butler v. State*, 842 So. 2d 817, 827 (Fla. 2003) ("[I]mpeachment may be through questioning concerning prior acts of misconduct in a situation where the

defendant has testified on direct examination that he has not or would not participate in such misconduct.").

Concerning the heightened penalties, in the two burglary cases for which police did not record Zadravec's confession, the prosecution charged Zadravec with two counts of grand theft in violation of Section 812.014(2)(a)(1), Fla. Stat., a first-degree felony punishable by 30 years of prison, and one count of armed burglary of a dwelling in violation of Section 810.02(2)(b), Fla. Stat., a felony punishable by life in prison. (Doc. 11-2 at 2, 36)

Trial counsel explained that Zadravec pled guilty so that trial counsel could move for a downward departure (Doc. 11-5 at 110–11):

| | |
|---|---|
| [Prosecutor:] | And did you discuss with your client specifically that [ ] ultimately the State would not have any problem proving the value? |
| [Trial counsel:] | I — I think I told him that in my opinion that the State would not have a lot of difficulty in establishing the value. |
| [Prosecutor:] | And did you also tell him that it would also look better to the judge when pleading open if he accepted responsibility for that and that would give the court a basis to downward depart? |
| [Trial counsel:] | Exactly. And that's something that we had discussed from — from the very beginning. Again, being aware of the possibility that we would — that we would potentially have to enter an open plea, you know, we discussed, you know that and throughout the process we wanted him to — to show remorse. Again, one of the reasons that, you know, he didn't bond out was so that we could establish good faith and show the judge that, you know, that any money that he had he would put it towards restitution. So |

| | | |
|---|---|---|
| | that was something that we had discussed from the very beginning of the case. | |
| [Prosecutor:] | And ultimately Mr. Zadravec agreed with that approach? | |
| [Trial counsel:] | Yes. | |
| [Prosecutor:] | . . . Do you recall what his bottom of the guideline score was? | |
| [Trial counsel:] | The bottom of the guidelines was around 13 years. | |
| [Prosecutor:] | So he did in fact receive a downward departure from the court; correct? | |
| [Trial counsel:] | He did, yes. | |

Consistent with that strategy, Zadravec wrote a five-page letter to the sentencing judge, confessed to all five burglaries, and asked for forgiveness. (Doc. 11-2 at 23–27) The trial court departed downward and sentenced Zadravec to 8 years of prison. (Doc. 11-2 at 15, 50) Moreover, at the evidentiary hearing, trial counsel testified that Zadravec "indicated pretty early on that he did not want to go to trial." (Doc. 11-5 at 113–14)

Zadravec's assertion that he would have rejected counsel's very successful strategy and insisted on risking a life sentence plus 60 years to challenge the detective's testimony concerning his confessions is not credible under the circumstances. Thus, the claim does not have "some merit" and is procedurally barred from federal review. *Martinez*, 566 U.S. at 14; *Hill*, 474 U.S. at 59; *Rosin v. United States*, 786 F.3d 873, 878–79 (11th Cir. 2015).

Ground Three is **DENIED**.

Accordingly, it is **ORDERED** that Zadravec's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Zadravec and **CLOSE** this case.

**CERTIFICATE OF APPEALABILITY AND
LEAVE TO PROCEED *IN FORMA PAUPERIS***

Because Zadravec neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on September 28, 2021.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE